**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| THE LLOYD NOLAND FOUNDATION, INC., | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | **LEAD CASE:**      CV-01-BE-0437-S |
| v. | ] | **MEMBER CASE:**  CV-01-BE-1904-S |
| | ] | |
| TENET HEALTHCARE CORP., | ] | |
| | ] | |
| **Defendant.** | ] | |

**MEMORANDUM OPINION**

I.     **INTRODUCTION**

This case is before the court on the motion for partial summary judgment filed by Tenet

Healthcare Corporation (the Defendant in the lead case, CV-01-BE-437-S) and Tenet

HealthSystem Medical, Inc. (the Plaintiff in the member case, CV-01-BE-1904-S) (respectively,

"Tenet Corp." and "Tenet Medical," and collectively as "Tenet Defendants") (filed in a single

document, Doc. 177).  The motion addresses Tenet Defendants' obligations to Plaintiff The

Lloyd Noland Foundation Inc. ("Foundation") under certain contractual provisions.  Following

briefing by both sides[1], the court held a hearing on this motion on August 1, 2007.

For the reasons discussed below, and those discussed on the record at the hearing,

---

[1] The parties' briefing and arguments regarding the issues presented in this case have been of very little assistance to the court in parsing the several complex agreements and the relationship between these agreements. Indeed, the parties have taken a very *imprecise* approach to this litigation, despite the fact that it arises out of three very *precise* contractual agreements (the Guaranty Agreement, the Stock Purchase Agreement, and the Asset Sale Agreement – all discussed in detail below).  Further, the conclusory legal analysis fell short of the standards the court expects in cases of this complexity.  The inadequacies of briefing on motions by both sides has resulted in the court's inability to find that either side has met its burden of proof on the Motions for Summary Judgment filed by these parties.  The burden of proof rests upon the parties - not the court.

1

Defendant/Third Party Plaintiff Tenet Corp.'s motion for partial summary judgment will be granted in part and denied in part.  Specifically, the court will grant the motion only as to the Foundation's claim against Tenet Corp. under the Guaranty Agreement based on: (1) Tenet Medical's breach of its obligation to obtain the Foundation's written consent before the sale of the Hospital to Fairfield Healthcare Authority ("Fairfield"); and (2) Tenet Corp.'s direct liability for the Retiree Medical Discount Program.  The court will deny Tenet Corp.'s motion as to all of the Foundation's other claims against Tenet Corp. under the Guaranty Agreement: (1) the claim based on Tenet Medical's alleged default of its obligation to bind successors and assigns to its duties under the Stock Purchase Agreement; (2) the claim based on Tenet Medical's default on its obligation to cooperate with the Foundation's efforts to obtain the LNF Beds by virtue of Fairfield's breaches of assigned duties; and (3) the claim that would impose indirect liability based on Tenet Medical's default on its obligation to indemnify the Foundation for any damages related to Tenet Lloyd Noland's assumption of the Retiree Program.

Plaintiff/Counterclaimant Tenet Medical's motion for partial summary judgment against the Foundation will be granted as to its claims for cost report payables/receivables under the Stock Purchase Agreement, and will be denied as to its claim for breach of the Grant Letter.

The determination of the amount due Tenet Medical will be delayed until a determination of whether that amount should be offset from any amounts due the Foundation.

## II.   FACTS

On October 4, 1996, the Foundation and Tenet Medical entered into a Stock Purchase Agreement, including an "Amendment Number Two," whereby Tenet Medical acquired the assets of the Lloyd Noland Hospital in Fairfield, Alabama.  Specifically, Tenet Medical

purchased the stock of two separate corporate entities, created for the purpose of effectuating the sale of the Hospital – Tenet HealthSystem Lloyd Noland Medical and Tenet HealthSystem Lloyd Noland Properties (collectively, "Tenet Lloyd Noland").  In agreeing to sell the Hospital, the Foundation reserved an option to repurchase 120 hospital beds, referred to as "the LNF Beds," from Tenet Lloyd Noland for $1.00.  *Tenet Medical* and Tenet Lloyd Noland also agreed to cooperate with the Foundation in having the LNF Beds relicensed, recertified or relocated for long-term acute care purposes.  In addition, Tenet Lloyd Noland agreed to assume the Foundation's responsibilities under the Lloyd Noland Retiree Medical Discount Program ("Retiree Program"), and *Tenet Medical* agreed to indemnify the Foundation against any damages incurred in relation to Tenet Lloyd Noland's assumption of the Retiree Program obligations.

The same day as the Stock Purchase Agreement was executed, Tenet Healthcare Corp. – the parent corporation of Tenet Medical – and the Foundation entered into a Guaranty Agreement; the Guaranty Agreement was an express condition to the sale of the Hospital and as security for performance of the obligations assumed by Tenet Medical and Tenet Lloyd Noland under the Stock Purchase Agreement.  Under the terms of the Guaranty Agreement, Tenet Corp. agreed to unconditionally guarantee the performance of certain obligations and duties by Tenet Corp., Tenet Medical, and any affiliate of Tenet Corp.  The Guaranty Agreement expressly identified the obligations with regard to the LNF Beds, and covered *Tenet Medical's* duty to indemnify the Foundation against any damages incurred in relation to Tenet Lloyd Noland's assumption of the Retiree Program obligations.

Also on October 4, 1996, the Foundation sent Tenet Medical a letter, referred to as the

"Grant Letter," offering to pay Tenet Medical one million dollars per year for a community health assessment to be conducted over a four-year period. Tenet Medical accepted the terms of the Grant Letter.

On November 15, 1999, the Fairfield Healthcare Authority acquired the Hospital by purchasing all of the assets of Tenet Lloyd Noland. At that time, the Foundation was pursuing a lengthy reapplication process, seeking two certificates of need ("CONs") to reclassify 100 existing "acute care" beds at the hospital to "long-term acute care beds." On February 11, 2000, Fairfield sued the Foundation in the Circuit Court for Montgomery County, seeking a judgment declaring, among other things, that the Foundation's option to repurchase the LNF Beds was void and unenforceable, and that the State Health Planning and Development Agency should be enjoined from further considering the Foundation's applications for CONs related to the LNF Beds. Two years later, on February 22, 2002, the Alabama Supreme Court entered a decision in the state court litigation largely favorable to the Foundation. *Lloyd Noland Found., Inc. v. Fairfield Healthcare Auth.*, 837 So. 2d 253 (Ala. 2002).

Specifically, the Court held that Fairfield assumed Tenet Lloyd Noland's obligations to sell the beds back to the Foundation and cooperate in their recertification, relicensing, and relocation for long-term acute care; Fairfield breached the cooperation clause by seeking to intervene in the certification process; Tenet Lloyd Noland's agreement to lease space to the Foundation for long-term acute care beds was valid and enforceable against Fairfield; and although Fairfield had not breached that lease, it owed a duty to renegotiate the lease in good faith when the Foundation attained the CONs. By the end of October 2002, the Montgomery County Circuit Court had determined that Fairfield successfully transferred to the Foundation the

4

LNF Beds.[2]

Meanwhile, the Foundation instituted the present lawsuit against Tenet Corp. for alleged violation of the parties' Guaranty Agreement. Additionally, in a now-consolidated action, Tenet Medical filed suit against the Foundation, for alleged breaches of the Stock Purchase Agreement and the Grant Letter.

This memorandum opinion addresses Defendant Tenet Corp.'s motion for partial summary judgment as to the Foundation's claims against Tenet Corp. under the Guaranty Agreement, and Plaintiff Tenet Medical's motion for summary judgment as to its claims against the Foundation under the Grant Letter and the Stock Purchase Agreement.

## III.    STANDARD OF REVIEW

Summary judgment allows a trial court to decide cases where no genuine issues of material fact are present. *See* Fed. R. Civ. P. 56. A court must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law. *Id*.

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). The movant can meet this burden by offering evidence showing no dispute of material fact, or by showing that the nonmoving party's evidence

---

[2] *See* Exh. RR to Hinton Aff (Doc. 141), report from alacourts.com showing order dated Oct. 29, 2002 "that court's order compelling sale of hospital beds has been complied w[ith] . . . ."

fails to meet some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. Once the movant meets this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 324 (quoting Fed. R. Civ. P. 56(e)). The responding party does not need to present evidence in a form admissible at trial; "however, he may not merely rest on [his] pleadings." *Id*.

In reviewing the evidence submitted, "the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in [its] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "The nonmovant need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mutual Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). After both parties have addressed the motion for summary judgment, the court must grant the motion if no genuine issues of material fact exist <u>and the moving party is entitled to judgment as a matter of law</u>. Fed. R. Civ. P. 56 (emphasis added). However, the nonmovant can defeat summary judgment by showing either a genuine issue of material fact or that the movant is not entitled to judgment as a matter of law.

## IV.   DISCUSSION

### A.   Applicable Law

Paragraph 4 of the Guaranty Agreement provides that Alabama law controls the interpretation of that agreement. Alabama follows the general rule that guaranty agreements, being but one type of contract, are controlled by the general principles of contract law. *Dill v. Blakeney*, 568 So. 2d 774, 777 (Ala. 1990); *Gov't Street Lumber Co. v. AmSouth Bank*, 553 So.

2d 68 (Ala. 1989).  As with any contract, when the terms of a guaranty agreement are unambiguous, the construction and legal effect of the guaranty contract are questions of law for the court to determine.  *Robbins Tire & Rubber v. Hunt*, 669 So. 2d 969, 970 (Ala. Civ. App. 1995).  The liability of a guarantor, however, flows from a principal obligor's breach of the underlying obligations of the primary contract: "Because the guaranty agreement secures a principal or primary obligation, the liability of the guarantor also depends upon a construction and application of the primary contract." *Ex parte Kaschak*, 681 So. 2d 197, 201 (Ala. 1996).

Section 19.3 of the Stock Purchase Agreement also provides that Alabama law controls interpretation of the Stock Purchase Agreement.   Under Alabama law,

> the words of a contract are to be given their ordinary meaning and [ ] the intention of the parties is to be derived, if possible, from the provisions of the contract itself. . . . Where a contract, by its terms, is plain and free from ambiguity, there is no room for construction and the contract must be enforced as written. . . .  "[A] document is unambiguous if only one reasonable meaning emerges." . . . When the terms of a contract are ambiguous, the true meaning of the contract becomes a question for the fact-finder.

*Austin Apparel, Inc. v. Bank of Prattville*, 872 So. 2d 158, 165 (Ala. Civ. App. 2003) (internal citations[3] omitted).   Accordingly, the court will look to principles of Alabama contract law in evaluating Tenet's motion for summary judgment.

**B.     The Guaranty Agreement**

Neither party disputes that the Guaranty Agreement was properly executed and that, pursuant to the Guaranty Agreement, Tenet Corp. guaranteed certain of Tenet Medical's obligations to the Foundation as provided in the Stock Purchase Agreement and its amendments.

_____

[3]  All internal citations except one were to Alabama Supreme Court decisions.

The Guaranty Agreement provides that "Guarantor [Tenet Corp.] hereby unconditionally guarantees the performance of the Obligations," which comprise three categories:

(1)     "the obligations by Purchaser [Tenet Medical] pursuant to the Stock Purchase Agreement";

(2)     "the continuing obligations of Purchaser, Guarantor and any Affiliate of Guarantor under Article XV of the Stock Purchase Agreement"; and

(3)     "the obligations of THSLNM [one of the two corporations comprising Tenet Lloyd Noland] pursuant to Article IX of the Lease [a lease agreement executed contemporaneously to the Stock Purchase Agreement]. . . ."

Neither party has argued that the language of the Guaranty Agreement is ambiguous or should not be construed according to its plain meaning.  Further, the court finds that the language is unambiguous.

In its arguments against the Motion for Summary Judgment, the Foundation has repeatedly emphasized the *unconditional* nature of the guaranty.  The court does not dispute that the scope of the guaranty is broad and sweeping *if the Guaranty Agreement is triggered*.  The Guaranty Agreement only comes into play, however, when a *default* on the underlying obligations (listed above) occurs:

> Guarantor hereby unconditionally guarantees *the performance of the Obligations.*  Further, Guarantor unconditionally guarantees the payment of all costs, attorneys' fees or expenses which may be incurred by Seller *by reason of <u>a default by Purchaser, Guarantor or any Affiliate of Guarantor</u> under this Agreement or with respect to the Obligations.*  [All emphasis added throughout].

Tenet Corp.'s unconditional guaranty is thus limited in scope in two ways: (1) it covers only the three types of "Obligations" identified above; and (2) it applies only upon a default of one of

8

those "obligations" by *Purchaser* [Tenet Medical], *Guarantor* [Tenet Corp.], or *any Affiliate of Guarantor*.

Accordingly, the court will examine whether each alleged violation of the Stock Purchase Agreement falls within the scope of the Guaranty Agreement.

**C.    The Lloyd Noland Foundation's Claims Against Tenet Corp.**

The Foundation's lawsuit against Tenet Corp. is predicated on several alleged breaches of the Stock Purchase Agreement: (1) Tenet Medical's failure to obtain prior written consent before selling the hospital to Fairfield in 1999; (2) Tenet Medical's failure to bind its successors and assigns to the terms and conditions of the Stock Purchase Agreement; (3) *Fairfield's* failure to cooperate with the Foundation's efforts to exercise its option to the LNF Beds – conduct that the Foundation contends is directly attributable to Tenet Medical; and (4) Tenet Medical's failure to fulfill its obligations with respect to the Retiree Medical Discount Program**.**

**1.    *Tenet Medical's Obligation to Obtain the Foundation's Prior Written Consent Prior to Sale of the Hospital***

Paragraph 7(a) of the Foundation's Complaint asserts that Tenet Medical breached its obligation to obtain prior written consent from the Foundation before the assignment to Fairfield of the assets, rights, and duties under the Stock Purchase Agreement.

The Stock Purchase Agreement did require that Tenet Medical obtain written consent from the Foundation.  Section 19.2, "Successors and Assigns," provides that "[n]o party hereto may assign any of its rights or delegate any of its duties under this Agreement without the prior written consent of the other parties . . . ."  On its face, this provision appears to fall within the scope of category (1) of the obligations covered by the Guaranty Agreement –  "obligations by

9

Purchaser [Tenet Medical] pursuant to the Stock Purchase Agreement."  Accordingly, *if* the court

finds that Tenet Medical has breached this obligation, Tenet Corp.'s unconditional guaranty

would be triggered.

However, Tenet Corp. argues that the Stock Purchase Agreement contains a survival

clause that limits the time period during which the provisions in the agreement are effective.

Section 11.1, "Survival," reads:

> Except as expressly set forth in this Agreement to the contrary, all
> representations, warranties, covenants, agreements and
> indemnifications of Purchaser and Seller, respectively, contained in
> this Agreement or in any document delivered pursuant hereto . . .
> shall continue to be fully effective and enforceable following the
> Closing Date *for a period of three (3) years and shall thereafter be
> of no further force and effect* . . . . (Emphasis added).

Tenet Corp. argues that the plain language of Section 11.1, the Survival Clause, dictates

that the covenant requiring prior written consent expired on October 4, 1999 – three years after

the Closing Date of the Stock Purchase Agreement.  Tenet Corp. notes, and the Foundation

admitted, that the hospital sale transaction to Fairfield closed on November 15, 1999, more than

three years after the Closing Date of the sale to Tenet.

The Foundation did not respond to Tenet Corp.'s argument as to the three-year survival

term; it failed to produce any facts to suggest that Tenet Medical assigned its rights or delegated

its duties under the Stock Purchase Agreement prior to October 4, 1999, or that the three-year

limitation did not apply to Section 19.2.  Therefore, the Foundation has waived any arguments

that the Survival Clause did not apply to the prior written consent requirement.  Based on the

plain language of the contract, the court thus finds that no obligation to obtain prior written

consent existed at the time of the sale on November 15, 1999 to Fairfield.  Consequently, Tenet

Medical did not default on this obligation under the Stock Purchase Agreement, and Tenet

Corp.'s unconditional guarantee under the Guaranty Agreement was not triggered.

Accordingly, as to the prior written consent issue, Tenet Corp. has demonstrated that no

genuine issue of material fact exists and that it is entitled to judgment as a matter of law.  The

court will grant Tenet Corp.'s motion for partial summary judgment as to the Foundation's claim

against Tenet Corp. under the Guaranty Agreement based on Tenet Medical's alleged breach of a

duty to obtain prior written consent before assigning its assets, rights, and duties under the Stock

Purchase Agreement; *i.e.*, the court finds no breach by Tenet Medical and thus no liability by

Tenet Corp. to the Foundation on this claim under the Guaranty Agreement.

> **2.      *Tenet Medical's Obligation to Bind its Successors and Assigns to the Terms and Conditions of the Stock Purchase Agreement.***

Paragraph 7(b) of the Foundation's Complaint states that Tenet Medical breached its

obligation to ensure that the terms and provisions of the Stock Purchase Agreement were binding

and enforceable on Fairfield.  Section 19.2 of the Stock Purchase Agreement, "Successors and

Assigns," provides that "[a]ll of the terms and provisions of this Agreement shall be binding

upon and shall inure to the benefit of and be enforceable by the respective successors and assigns

of the parties hereto."  On its face, this requirement falls within category (1) of the obligations

covered by the Guaranty Agreement:  "obligations by Purchaser [Tenet Medical] pursuant to the

Stock Purchase Agreement."  To determine whether Tenet Corp.'s liability under the Guaranty

Agreement is triggered, therefore, the court  must determine whether Tenet Medical in fact

breached its obligation to bind Fairfield to the terms and conditions of the Stock Purchase

Agreement.[4]

Tenet Corp. urges the court to apply the doctrine of claim preclusion relying on a decision by the Alabama Supreme Court – in the litigation between Fairfield and the Foundation concerning the LNF Beds – regarding the issue of whether Fairfield assumed the obligations of Tenet Medical.  There, the Alabama Court held that the Asset Stock Agreement facilitating the sale of the Hospital to Fairfield "clearly and unambiguously provides that Fairfield assumed the obligations of Tenet."  *Lloyd Noland Found., Inc. v. Fairfield Healthcare Auth.*, 837 So. 2d 253, 266-67 (Ala. 2002).

To support its argument that this court should adopt the Alabama Supreme Court's decision, Tenet Corp. cites, without analysis, the Eleventh Circuit decision of *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1187 (11th Cir. 2003).  *Davila* sets forth the requirements for applying the doctrine of claim preclusion (*res judicata* in federal cases).  Although the Foundation does not address this argument directly, Tenet Corp.'s claim preclusion argument fails as a matter of law.

First, because this court's jurisdiction over the instant case is based on the parties' diversity of citizenship, the court will look to Alabama's laws of issue preclusion.  *See Community State Bank v. Strong*, 485 F.3d 597 (11th Cir. 2007) (citing *Agripost, Inc. v. Miami-Dade Cty., ex rel. Manager*, 195 F.3d 1225, 1229 n. 7 (11th Cir.1999)).  *Davila* articulates the standards for claim preclusion under *federal* law, not *Alabama* law and thus does

---

[4] Tenet Corp. has not argued that, like the prior written consent requirement, the obligation to bind successors and assigns to the terms and obligations of the Stock Purchase Agreement expired three years after the Closing Date.  The court observes that, if the three year Survival limitation applied to the prior written consent requirement, *contained within* the "Successors and Assigns" provision, it arguably would also limit the requirement to bind successors and assigns to a period of three years as well.  However, no such argument has been presented to this court, and the court will not base its decision on arguments not raised and briefed by the parties.

not control this issue.  Tenet Corp. has not provided the court with any Alabama law on

preclusion.

Nonetheless, even under *Davila*, Tenet Corp.'s assertion of claim preclusion would fail.

*Davila* holds:

> [c]laim preclusion will bar a subsequent action if (1) the prior
> decision was rendered by a court of competent jurisdiction; (2)
> there was a final judgment on the merits; (3) the parties were
> identical in both suits; and (4) the prior and present causes of
> action are the same.

*Davila*, 326 F.3d at 1187 (11th Cir. 2003) (emphasis added) (internal citations omitted).  Thus, to

apply the doctrine of claim preclusion, the parties in the two suits must be identical, and the

causes of action must be the same.  *Id.*  The state court action involved the Foundation's claims

against Fairfield as opposed to the Foundation's claims against Tenet Corp., which are at issue

here.  Notably, no Tenet entity participated as a party in the state case.  The state action arose as a

declaratory judgment action to examine the validity of the Foundation's option to repurchase the

LNF Beds.  The parties and the causes of action, therefore, were different in that case, and under

*Davila*, Tenet Corp. cannot succeed on its assertion of claim preclusion.

The doctrine of *issue preclusion (collateral estoppel)*, rather than claim preclusion (*res

judicata*), might call for a different standard in determining whether this court can adopt the

findings of the Alabama Supreme Court.  Tenet Corp., however, has not advanced any argument

or law supporting this court's application of the doctrine of issue preclusion.[5]  Tenet Corp. also

---

[5] In any event, this court's initial research into Alabama preclusion law suggests that Tenet Corp. would not
be able to assert issue preclusion because Alabama, unlike federal courts, has not abandoned the requirement that
both parties be the same under the issue preclusion doctrine.  *See Ex parte Flexible Prods. Co.*, 915 So. 2d 34, 45
(Ala. 2005).

has not advanced any other argument, besides claim preclusion, that Tenet Medical bound Fairfield to the terms and conditions of the Stock Purchase Agreement.[6]  In addition, the court has insufficient evidence before it as to whether Tenet Medical bound Fairfield to its obligations under the Stock Purchase Agreement.  Therefore, the court cannot conclude that no disputed issue of fact exists on this issue.

As such, Tenet Corp. has failed to meet its burden to demonstrate that no genuine issue of material fact exists as to whether Tenet Medical defaulted on its obligation to bind successors and assigns to its obligations under the Stock Purchase Agreement, and also failed to establish that it is entitled to judgment as a matter of law on this issue.  The court will deny Tenet Corp.'s motion for summary judgment without prejudice as to the Foundation's claim against Tenet

---

[6]  This court has independently reviewed the Asset Sale Agreement that facilitated the sale of the Hospital to Fairfield.  The court first notes that the Asset Sale Agreement is between Fairfield and *Tenet Lloyd Noland*, not Fairfield and *Tenet Medical*; and all provisions in the Asset Sale Agreement providing for Fairfield's assumptions of duties under the Stock Purchase Agreement refer to *Tenet Lloyd Noland's* duties, *not Tenet Medical's*.  The court, therefore, questions whether *Tenet Medical* ever created an assignment of its rights or a delegation of its duties arising under the Stock Purchase Agreement.  If it did not create such an assignment, Tenet Medical has no assigns nor successors to trigger its obligation, under Section 19.2 of the Stock Purchase Agreement, to bind such assigns or successors.

Tenet Lloyd Noland, however, is a signatory to Amendment Number Two to the Stock Purchase Agreement, and thus is required to bind its successors and assigns to its obligations under that agreement. Amendment Number Two to the Stock Purchase Agreement includes a provision in Paragraph 11 that the Amendment "shall be governed by the Provisions of the Agreement regarding choice of law, attorneys' fees, and *successors and assigns*." (Emphasis added.)  Consequently, this court assumes that *Tenet Lloyd Noland* – which signed an "Acknowledgment" that it would comply with the provisions of Article XV of the Stock Purchase Agreement regarding the LNF Beds – was also required to bind its successors and assigns to its obligations under the Stock Purchase Agreement.

Having reviewed the Asset Sale Agreement, the court is of the opinion that Tenet Lloyd Noland likely did ensure that its obligations under the Stock Purchase Agreement were binding on Fairfield.  However, because neither party has argued or briefed the substance of whether Tenet Lloyd Noland bound Fairfield to its obligations under the Stock Purchase Agreement – perhaps because the Foundation's Complaint speaks only of *Tenet Medical's* alleged default – the court will not *sua sponte* reach a decision on that issue.  The court recognizes that it will need to make an interpretation of the Asset Sale Agreement as a matter of law before the case goes to a jury on factual issues, but the burden of proof at summary judgment stage rests upon the movant to provide proof that it is entitled to judgment as a matter of law.  This Tenet has failed to do and the court will not rule on issues and arguments not before it.

Corp. under the Guaranty Agreement insofar as it is based on Tenet Medical's breach of a duty to bind its successors and assigns to its obligations under the Stock Purchase Agreement.

### 3.      Tenet Corp.'s Liability for Fairfield's Breach

Paragraph 7(c) of the Foundation's Complaint states: "By its conduct described in paragraphs (a) and (b) above [paragraph (b) containing several subsections dealing with Fairfield's misconduct], Tenet Medical breached its obligation to cooperate with the Foundation in having 120 beds relicensed, recertified or relocated for long term acute-care purposes . . . ." As this court understands this provision of the Complaint, the Foundation seeks redress under the terms of the Guaranty Agreement for *Fairfield*'s misconduct, which the Foundation claims is directly attributable to Tenet Medical.[7]

Essentially, the Foundation now argues that, even if Tenet Medical bound its assignee[8] Fairfield to the terms and obligations of the Stock Purchase Agreement, Tenet Medical was not relieved from those obligations. In fact, the Foundation goes one step further and argues that Tenet Medical can be held liable for the defective performance of its assignee Fairfield.

Although the Stock Purchase Agreement expressly provides that the parties thereto must bind their successors and assigns, it remains silent as to whether a party who makes such an

---

[7] At the hearing held on August 1, 2007, counsel for the Foundation represented to this court that it is seeking redress not for any separate conduct of Tenet Medical, but *for Fairfield's breach only*, which the Foundation argues is imputed to Tenet Medical. Specifically, the court asked counsel for the Foundation: "[I]t is not the Foundation's argument that Tenet separately had some kind of continuing obligation under this provision after it sold to Fairfield, but, in essence, that Fairfield's breach is imputed to Tenet?" Counsel responded: "Both Tenet and Tenet Medical, that's correct. . . . It's attributable to both of them."

[8] The court recognizes the distinction that one *assigns rights* and *delegates duties*. The *assignment of a contract* as a whole, however, includes both the assignment of rights and the delegation of duties included in the terms of the contract. Accordingly, when the court refers to an assignment of the contract, it incorporates both the rights and duties under the contract as a whole.

assignment remains liable for the assigned obligations.[9]  Instead, the Foundation relies on what it refers to as a "well-settled principle" of contract law, by citing – not Alabama cases – but a horn book:

> While a party to a contract may as a general rule assign all his beneficial rights . . .  His liability under the contract is not assignable *inter vivos* because anyone who is bound to any performance whatever . . . cannot by any act of his own, or by any act in agreement with any other person than his creditor or the one to whom his performance is due, cast off his own liability and substitute another's liability.  If this were not true, obligors could free themselves of their obligations by the simple expedient of assigning them.

Williston on Contracts, Vol. 29, § 74:27 at p. 414 (4th ed. 2003).

The Foundation further cites case law from the Fifth Circuit and the Bankruptcy Court of the Southern District of Alabama, both noting that assignment of rights under a contract does not relieve the assignor of its obligations under the assigned contract.  *Ingalls Iron Works Co. v. Fruehauf Corp.*, 518 F.2d 966, 969 (5th Cir. 1975) (discussing requirements for novation); *In re:*

---

[9]  Section 19.2, "Successors and Assigns," reads in its entirety:

> All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto.  No party hereto may assign any of its rights or delegate any of its duties under this Agreement without the prior written consent of the other parties; provided, however, that Purchaser, in its sole discretion, can assign its rights and obligations under this agreement to (i) AHS [Alabama Health Services, an affiliate of Tenet Medical] or (ii) any entity (A) which is directly or indirectly wholly-owned by Tenet or (B) as to which Tenet has "control" (as such term is defined in Section 2.23(b) above).  Purchaser acknowledges that any assignment pursuant to Section 19.2(i) or 19.2(ii) above shall not relieve Purchaser from any of its obligations under this Agreement.

The above provision contains only two limitations to the parties' abilities to fully delegate their duties under the contract: (1) any assignment – other than the two listed in clauses (i) and (ii) – must occur with the other party's prior written consent; and (2) any assignment by Purchaser [Tenet Medical] to AHS or entities wholly-owned or controlled by Tenet Medical shall not relieve Tenet Medical of its obligations.  The contract neither precluded nor addressed the consequences of any other type of assignment.  As the court previously held, the requirement of written consent expired after three years from closing pursuant to the Survival Clause.

*Noletto*, 280 B.R. 868, 872 (Bankr. S.D. Ala. 2001) (discussing transfer of loan servicing rights without transfer of legal claim in bankruptcy court).[10]   The only *Alabama* authority the Foundation cites appears in a footnote:

> Under the early Alabama cases, even a novation by which a new obligor is accepted does not entirely eliminate the creditor's right of recourse against the original obligor. See *Copeland v. Beard*, 217 Ala. 216, 115 So. 2d 389 (1928), where the Supreme Court of Alabama, citing numerous cases, notes that the original debtor becomes a "quasi surety" who may remain liable if the creditor elects to sue him.[11]

This case, however, does not involve a novation nor a debtor/creditor relationship.  Neither Tenet Corp. nor Tenet Medical offered any legal authority to rebut the Foundation's argument that an assignment of rights does not relieve the assignor of liability.  Instead, Tenet Corp. relies exclusively on *Lloyd Noland Found., Inc. v. Fairfield Healthcare Auth.*, 837 So. 2d 253, 266-67 (Ala. 2002), which did not address the effect of the binding assignment to Fairfield on Tenet Lloyd Noland's obligations at all, much less its liability for Fairfield's breach.

This court has reviewed the authorities cited by the Foundation, and has reviewed additional Alabama cases that appear to support the Foundation's argument.  *See DuPont v. Yellow Cab Co. of Birmingham*, 565 So. 2d 190, 194 (Ala. 1990) (Jones, J., dissenting); *Meighan v. Watts Construction Co.*, 475 So. 2d 829, 834 (Ala. 1985).  None of the authorities cited by either side or found by the court addressed the issue of an assignment outside of the contractually designated time within which written consent is required - perhaps a significant distinction in this

---

[10]  The Foundation also cites a case from the Seventh Circuit Court of Appeals and the Supreme Court of South Carolina, neither of which this court finds instructive in determining *Alabama* contract law.

[11]  Pl.'s Opp. Br. (Doc. 185), at 11 n.6.

case.  However, upon consideration of these authorities, the court concludes that Tenet Corp. has

not established as a matter of law that Tenet Medical could not have defaulted, by virtue of

Fairfield's breaches of the assigned duties, on its obligations to cooperate with the Foundation's

efforts to obtain the LNF Beds.  As such, Tenet Corp. has not established that it is entitled to

judgment as a matter of law on the Foundation's claim under the Guaranty Agreement for such a

default by Tenet Medical.[12]  Tenet Corp.'s motion for partial summary judgment on this issue

should be denied without prejudice.

### 4. *Tenet Medical's Obligation to Honor the Lloyd Noland Retiree Medical Discount Program*

The Foundation's complaint does not clearly articulate an alleged breach by Tenet

Medical of the obligation to honor the Retiree Medical Discount Program.  Paragraph 7(b)(4) of

the Complaint merely states that *Fairfield* failed to honor the Program.  The court will assume,

however, that the portion of the Complaint dealing with the Retiree Medical Discount Program is

then attributed to Tenet Medical in Paragraph 7(b) of the Complaint, even though that paragraph

only specifically mentions Fairfield's conduct with respect to the Retiree Medical Discount

Program.

---

[12]  The fact that the court previously denied the Foundation's motion for summary judgment on this point does not dictate a different conclusion.  Although no genuine issue of material fact exists, neither moving party met its respective burden of proof to establish that it was entitled to judgment as a matter of law.

(a)     Tenet Corp.'s Direct Liability under the Guaranty Agreement for
the Retiree Medical Discount Program

Section 4.24 of the Stock Purchase Agreement provides that "Corporation [Tenet Lloyd

Noland] will . . . assume Sellers [sic] obligations under the Lloyd Noland Retiree Medical

Discount Program . . . ."  Additionally, Section 1.5(c)(11) provides that "Corporation [Tenet

Lloyd Noland] shall assume and agree to discharge . . . the obligations arising on or after the

Asset Transfer Date under those certain Benefit Plans identified on Exhibit 1.5(c)(12) [which

includes the Retiree Medical Discount Program]."

Tenet Corp. argues that the obligations regarding the Retiree Medical Discount Program

do not fall within the scope of the Guaranty Agreement[13] because the Stock Purchase Agreement

required *Tenet Lloyd Noland* – and not Tenet Medical – to honor the Retiree Medical Discount

Program.  Tenet Lloyd Noland's obligation to honor the Retiree Medical Discount Program does

not fall within category (1) of the obligations covered in the Guaranty Agreement, which only

includes obligations of the Purchaser (Tenet Medical).  Category (2) only includes obligations

arising under Article XV of the Stock Purchase Agreement, which deals with Long-Term Acute

Care (including the LNF Beds) and contains no reference to the Retiree Medical Discount

Program.  Category (3) only applies to Tenet Lloyd Noland's obligations arising under Article IX

---

[13] Again, the Guaranty Agreement provides that "Guarantor [Tenet Corp.] hereby unconditionally guarantees the performance of the Obligations," which comprise three categories:

(1) "the obligations by Purchaser [Tenet Medical] pursuant to the Stock Purchase Agreement";

(2) "the continuing obligations of Purchaser, Guarantor [Tenet Corp.] and any Affiliate of Guarantor under Article XV of the Stock Purchase Agreement"; and

(3) "the obligations of THSLNM [a corporate entity created to facilitate the sale of the Hospital] pursuant to Article IX of the Lease [a separate lease agreement executed contemporaneously to the Stock Purchase Agreement] . . . ."

Guaranty Agreement at 1.

19

of a Lease Agreement between Tenet Lloyd Noland and the Foundation.  That provision of the Lease Agreement also does not refer to the Retiree Medical Discount Program.

To counter this reasoning, the Foundation points to Tenet Medical's Third Party Complaint against Fairfield, in which Tenet Medical stated that it had assumed obligations regarding the Retiree Program.  The Foundation also notes that Tenet Corp., in a separate class action litigation involving the Retiree Program,[14] also admitted that Tenet Medical agreed to administer the Retiree Program.  As such, the Foundation argues that Tenet Corp. is now judicially estopped from arguing that Tenet Medical did not assume the obligations for the Retiree Program.

Tenet Corp. counters that it has consistently maintained that Tenet Medical was not responsible for the Retiree Program, and notes that it only conceded that any obligation, if it existed at all, expired in 1999 when it sold the Hospital or in 2004 when the Hospital closed. Tenet Corp. thus views its assertions in the parallel litigation as alternative defenses or legal theories only; and, as such, it is not bound by the advancement of alternative theories. Additionally, Tenet Corp. argues that judicial estoppel, which is within the court's discretion, should not be invoked under these circumstances.

When deciding whether the doctrine of judicial estoppel should apply, courts have traditionally looked at three basic factors:

> 1) whether a party's later position was clearly inconsistent with its earlier position; 2) whether the party succeeded in persuading a court to accept the party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was

---

[14] *Sellers v. Tenet Healthcare Corp.*, CV-03-0457.

20

> misled; and 3) whether the party seeking to assert an inconsistent
> position would derive an unfair advantage or impose an unfair
> detriment on the opposing party if not estopped.

*Transamerica Leasing, Inc. v. Institute of London Underwriters*, 430 F.3d 1326, 1335 (11th Cir.

2005) (citing *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001)).

The court does not view Tenet's prior positions regarding the Retiree Program as so

inconsistent with its position now as to warrant the imposition of judicial estoppel.  Tenet Corp.

played a different role in both the Third Party Complaint (where it seeks indemnification from

HealthSouth and Fairfield *in the event that it is held liable* in this action) and the separate class

action (where Defendant Tenet Corp. contended that any obligation it might have had to

administer the Program ended when it sold the Hospital to Fairfield in 1999).  Its statements in

those cases, therefore, are not clearly inconsistent with its position in the instant litigation, and no

court has ever affirmatively adopted or been persuaded by Tenet's earlier positions.  In addition,

Tenet will not gain any unfair advantage from now arguing that Tenet Medical never assumed the

obligations with respect to the Retiree Program, particularly where the plain language of the

Guaranty Agreement and the Stock Purchase Agreement indicate that the Retiree Program was

not subject to the unconditional guarantee.

The Foundation also attempts to assert issue preclusion, arguing that Judge Propst, in the

class action litigation related to the Retiree Program, found that "[Tenet Medical] expressly

assumed [the Foundation's] responsibilities under the [Retiree Program].  In connection with this

arrangement, Tenet [Corp.] expressly 'guaranteed' [Tenet Medical's] obligations under the

[Retiree Program]."[15]

However, the second element of issue preclusion – that the issue was actually litigated – is not met.  Judge Propst's decision incorporating the above language was at the motion to dismiss stage.  As such, his "findings" do not constitute actual findings of fact, but merely reiterate the assertions in the complaint, which a court must assume to be true on a motion to dismiss.  Even later, Judge Propst never actually decided the merits of the issue of whether Tenet Medical assumed the Retiree Program obligations, because HealthSouth voluntarily agreed to assume the obligations, rendering the issue in Judge Propst's court moot.  Accordingly, Judge Propst's decision has no bearing on this court's determination of whether Tenet Medical (as distinguished from Tenet Lloyd Noland) assumed obligations with respect to the Retiree Program.

In conclusion, Tenet Lloyd Noland, not Tenet *Medical*, assumed the obligations with respect to the Retiree Program.  As such, the obligations do not fall within the scope of the Guaranty Agreement, as discussed above.  Tenet Corp. may not be held liable under the Guaranty Agreement based on this theory and, therefore, Tenet Corp. has established that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law under this theory.

      (b)     Tenet Corp.'s Indirect Liability Under the Guaranty Agreement for the Retiree Program via the Indemnification Clause in the Stock Purchase Agreement

The Foundation, however, also raises a new argument regarding the Retiree Medical Discount Program – one not found in its Complaint or in any pleading prior to its Brief in

---

[15] Pl.'s Opp. To Def.'s Mot. for Partial S.J. at 7, 10 (citing *Sellers v. Tenet Healthcare Corp.*, CV-03-0457).

Opposition to Tenet Corp.'s motion for partial summary judgment.  The Foundation now argues that Tenet Medical agreed to indemnify the Foundation from any damages connected to the obligations Tenet Lloyd Noland assumed with respect to the Retiree Medical Discount Program. Section 11.3 of the Stock Purchase Agreement states that "Purchaser [Tenet Medical] shall keep and save Seller [the Foundation] forever harmless from and shall indemnify and defend Seller against any and all Damages . . . in any way relating to, connected with or arising or resulting from . . . the Assumed Obligations [which include Tenet Lloyd Noland's obligations regarding the Retiree Medical Discount Program]."

Notably, the first time the Foundation has advanced a claim for indemnification pursuant to the Stock Purchase Agreement with respect to the Retiree Medical Discount program is in its opposition brief to Tenet Corp. and Tenet Medical's motion for partial summary judgment.  The Foundation did not even mention this indemnification provision in its complaint or amended complaint, asserting only that Fairfield failed to honor the obligations of the Retiree Program, and that retirees would cease to get discounted medical benefits when HealthSouth sold the Hospital.  Tenet, however, did not object to this new theory of liability.

In any event, the indemnification clause *would* fall within the terms of the Guaranty Agreement, because it imposes an obligation on *Tenet Medical* to indemnify the Foundation in certain circumstances.  The first category of obligations covered in the Guaranty Agreement includes "the obligations by Purchaser [Tenet Medical] pursuant to the Stock Purchase Agreement."  The indemnification obligation of  Tenet Medical falls within this broad category of obligations Tenet Corp. guaranteed.

 Indeed, in response Tenet Corp. does not argue that the Guaranty Agreement does not

23

cover a default by Tenet Medical on the indemnification obligation.  Rather, Tenet argues that the indemnification provision only applies when the Foundation can assert that it suffered damages relating to the obligation to honor the Retiree Medical Discount Program.  Although the court agrees with Tenet's interpretation of the indemnification provision, a genuine issue of material fact remains as to whether the Foundation has suffered any damage "in any way relating to, connected with or arising or resulting from" the Retiree Medical Discount Program.

To support its contention that the Foundation had not suffered any damages that would invoke the indemnification provision, Tenet's reply brief stated that J. Timothy Francis – Lloyd Noland's attorney in the separate class action lawsuit arising out of the Retiree Medical Discount Program –  made a number of representations to Judge Greene in the *Sellers* case that suggest that the Foundation suffered no damages *prior* to the closing of the Hospital.  Tenet further argues that the Foundation could not have suffered any damages *after* the closing of the Hospital with respect to the Program, because the Program is conditioned on the continued existence and availability of the Hospital.

The Foundation, after Tenet had filed its Reply brief, filed a "Motion to Strike" (Doc. 192), seeking to strike Tenet's representations about whether the Foundation had suffered damages related to the Program.  Although the court has denied the Motion to Strike, it incorporates into the record the affidavit of J.Timothy Francis, filed as an exhibit to the Foundation's Motion to Strike.  In that affidavit, Mr. Francis denies making the statements attributed to him and states that the Foundation covered expenses incurred when the defendants in the separate class action litigation (Tenet Corp., Fairfield, and HealthSouth Corp.) breached their responsibilities to the Retiree Program.  As such, the affidavit creates a genuine issue of

24

material fact as to whether the Foundation suffered damages sufficient to trigger the indemnification provision in the Stock Purchase Agreement.  If the Foundation has suffered such damages, and Tenet Medical has failed to indemnify it for those damages, then Tenet Corp.'s liability under the Guaranty Agreement will be triggered.  Tenet Corp.'s motion for partial summary judgment on the Foundation's claims regarding the Retiree Program should be denied, in light of this new theory of liability under the indemnity agreement.

**D.      Tenet Medical's Claims against the Lloyd Noland Foundation**

In the consolidated case, Tenet Medical as plaintiff has asserted claims against the Foundation for breach of a Grant Letter, and for breach of the Stock Purchase Agreement.  Tenet Medical now moves for summary judgment on these claims.  As outlined below, the court will deny Tenet Medical's motion for summary judgment as to its claim under the Grant Letter, and will grant Tenet Medical's motion as to its claim for cost report payables/receivables under the Stock Purchase Agreement.

**1.      Grant Letter**

Under the Grant Letter, dated October 4, 1996, the Foundation agreed to pay Tenet Medical one million dollars per year for a community health assessment to be conducted over a four-year period.  Tenet Medical asserts that it performed all obligations under the Grant Letter, and that the Foundation stopped making payments under the terms of the Letter beginning on July 1, 1999.  As such, Tenet Medical argues that the Foundation owes it a total balance of $375,000.

The Foundation counters Tenet Medical's claim with an affidavit from the Foundation's CFO Gary Goff, who states that Tenet Medical did not comply with *its* obligations under the

25

Grant Letter.  Goff states that Tenet Medical only produced a single report in 1998, rather than an annual plan report for four years as required under the terms of the letter, and that the Foundation received no additional assessments, studies, reports or master plans from Tenet Medical.  The affidavit further asserts that the Foundation then sent Tenet Medical a letter seeking an accounting of the costs incurred in conducting the study, noting that under the terms of the Grant Letter, excess funds were to be used for indigent care at the Hospital.  When Tenet Medical failed to respond to this letter, the Foundation made no further payments under the terms of the Grant Letter.

Counsel for Tenet Medical acknowledged, at the hearing held on August 1, 2007, that a genuine issue of material fact exists as to its claims under the Grant Letter.  The key questions underlying the breach of the Grant Letter remain unresolved.  Tenet Medical's motion for partial summary judgment will, therefore, be denied without prejudice as to the claim for breach of the Grant Letter.

### 2.      Stock Purchase Agreement

Tenet Medical has also asserted a claim against the Foundation for breach of the Stock Purchase Agreement.  Tenet Medical states that, under the terms of the Stock Purchase Agreement, it was entitled to all cost report payables/receivables from October 4, 1996 forward.[16] Tenet Medical has produced affidavits stating that the Foundation retained $30,242.00 of payables/receivables for the fiscal year ending May 31, 1998.

As stated at the hearing held on August 1, 2007, the Foundation does not dispute that it

---

[16]  Tenet Medical has not actually indicated where in the Stock Purchase Agreement such a clause is found, but has produced an affidavit stating that "Pursuant to the Stock Purchase Agreement, Tenet Medical was entitled to all cost report payables/receivables from October 4, 1996 forward."  The Foundation did not dispute this assertion.

owes the cost report payables/receivables pursuant to the Stock Purchase Agreement.  It contends, however, that any amount it owes is offset by the amount owed to it by Tenet.   Tenet Medical has established that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law.  Tenet Medical's motion, therefore, will be granted as to its claim for cost report payables/receivables in the amount of $30,242.00.  The court, however, will reserve issuing a judgment as to that amount until the remaining issues can be resolved.  At that time, the court can determine whether any judgment exists in favor of the Foundation to offset the amounts it owes pursuant to the cost report payables/receivables agreement.

## V.    CONCLUSION

For the reasons discussed above, Tenet Corp.'s motion for partial summary judgment will be granted in part and denied in part by separate order.

Specifically, the court will grant the motion only as to the Foundation's claim against Tenet Corp. under the Guaranty Agreement based on: (1) Tenet Medical's breach of its obligation to obtain the Foundation's prior written consent before the sale of the Hospital to Fairfield; and (2) Tenet Corp's direct liability for the Retiree Medical Discount Program.  The court will deny Tenet Corp.'s motion without prejudice as to all of the Foundation's other claims against Tenet Corp. under the Guaranty Agreement: (1) the claim based on Tenet Medical's alleged default of its obligation to bind successors and assigns to its duties under the Stock Purchase Agreement; (2) the claim based on Tenet Medical's default on its obligation to cooperate with the Foundation's efforts to obtain the LNF Beds by virtue of Fairfield's breaches of assigned duties; and (3) the claim that would impose indirect liability based on Tenet Medical's default on its obligation to indemnify the Foundation for any damages related to Tenet

Lloyd Noland's assumption of the Retiree Program.

Tenet Medical's motion for partial summary judgment as to its claims against the Foundation will be granted as to its claims for cost report payables/receivables under the Stock Purchase Agreement, and will be denied as to its claim for breach of the Grant Letter.

A separate order will be entered contemporaneously with this memorandum opinion.

DATED this 28th day of September, 2007.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE