FILED

2008 Sep-24  PM 05:12
U.S. DISTRICT COURT
N.D. OF ALABAMA



**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **THE LLOYD NOLAND FOUNDATION, INC.,** ] | |
| ] | |
| **Plaintiff,** ] | |
| ] | **LEAD CASE:      CV-01-BE-0437-S** |
| **v.** ] | **MEMBER CASE:  CV-01-BE-1904-S** |
| ] | |
| **TENET HEALTHCARE CORP.,** ] | |
| ] | |
| **Defendant/Third-Party Plaintiff,** ] | |
| ] | |
| **v.** ] | |
| ] | |
| **CITY OF FAIRFIELD HEALTHCARE AUTHORITY, et. al.,** ] | |
| ] | |
| **Third-Party Defendants** ] | |
| ] | |

**<u>MEMORANDUM OPINION</u>**

This matter is before the court on "Motion for Partial Summary Judgment" (doc. 225) filed

by Lloyd Noland Foundation, Inc.; "Renewed Motion for Partial Summary Judgment" (doc. 258)

by Tenet Corp.; and "Cross-Motion for Partial Summary Judgment" (doc. 262) by Tenet Corp.

and Tenet Medical.

For the reasons stated in this Memorandum Opinion, the court will GRANT  Lloyd

Noland Foundation, Inc.'s motion for partial summary judgment against Tenet and declare that

Tenet remains liable for any breaches by Fairfield and/or HealthSouth as to obligations under the

contract document; GRANT Tenet Corp.'s motion for partial summary judgment on Count I of

the Third Party Complaint against HealthSouth and Fairfield; and DENY Tenet Corp's cross-

1

motion for partial summary judgment against Lloyd Noland Foundation.

## I. PROCEDURAL HISTORY

The instant suit involves two cases, the lead case (CV-01-BE-437) and a member case (CV-01-BE-1904), eventually consolidated.  In the lead case, the Lloyd Noland Foundation, Inc. ("the Foundation") sued Tenet Health Care Corporation ("Tenet Corp.") in 2001, under the terms of a Guaranty Agreement that Tenet Corp. signed in connection with the Foundation's sale of its hospital to Tenet HealthSystem Medical, Inc.  ("Tenet Medical").  In its Answer to the Foundation's Complaint, Tenet Corp. brought a Third Party Complaint, asserting a single claim for indemnity against Fairfield Healthcare Authority ("Fairfield") and HealthSouth Corporation ("HealthSouth"). Subsequently, Tenet Corp. filed an Amended Third Party Complaint that included two counts: Count I alleged a claim for contractual indemnity against both Fairfield and HealthSouth; and Count II alleged a claim for common law indemnity against only Fairfield.

In the member case, Tenet HealthSystem Medical ("Tenet Medical") brought suit against the Foundation stating two counts for breach of contract.  Count I alleged that the Foundation had breached its contract set forth in a grant letter ("the Grant Letter") dated October 4, 1996, agreeing to pay Tenet Medical one million dollars per year for four years, for a community health assessment to be conducted over that four-year period.  Tenet Medical claimed that the Foundation still owed Tenet Medical the sum of $375,000 under this contract.  Count II alleged that the Foundation had breached a stock purchase agreement dated July 15, 1996 ("the Stock Purchase Agreement").  As part of the Stock Purchase Agreement, the Foundation retained the rights to all cost report payables/receivables prior to October 4, 1996 and Tenet Medical was entitled to all cost report payables/receivables from that date forward.  Tenet Medical claims that

the Foundation improperly retained $30,242.00 due Tenet Medical for the fiscal year ending May 31, 1998.

The Foundation responded with a two-count Counterclaim against Tenet Medical, alleging in Count I that Tenet Medical committed breaches of the Stock Purchase Agreement; and in Count II that Tenet Medical breached the agreement set forth in the Grant Letter.  Subsequently, Tenet Medical filed a Third-Party Complaint against Fairfield in the member case, referencing an Asset Sale Agreement in 1999 between sellers, Tenet Medical and THLNP, and the buyer, Fairfield.  In the Asset Sale Agreement, Fairfield acquired the assets of the former Lloyd Noland Hospital and assumed certain obligations of Tenet Medical and Tenet Lloyd Noland, including their obligations under the Stock Purchase Agreement at issue in the lead case.  Tenet Medical claimed that the Foundation's damages, if any, were the result of Fairfield's actions or failure to act regarding its obligations assumed in the Asset Sale Agreement.

In January of 2002, the court consolidated the two cases.

The parties have filed numerous potentially dispositive motions in this case.  Rather than recite all of the rulings, the court will note the following relevant rulings that granted partial summary judgment: (1) the court granted Tenet Corp.'s motion for summary judgment only on the the Foundation's claims against Tenet Corp. under the Guaranty Agreement based on (a) Tenet Medical's alleged breach of its obligation to obtain the Foundation's written consent before the sale of the Hospital to Fairfield, finding that this requirement expired on October 4, 1999; and (b) Tenet Corp.'s direct liability for the Retiree Medical Discount Program (doc. 201 & 202); and (2) the court granted partial summary judgment for Tenet Medical and against the Foundation as to its claims for cost report payables/receivables, finding that the Foundation improperly retained

$30,242.00; however, the court reserved issuing a judgment until a determination was made as to any offset due the Foundation (doc. 203).  Because the rulings regarding indemnity are complex and relevant, the court will list them in more detail below.

### *Motions for Summary Judgment Regarding Indemnity and the Third Party Complaint*

In April 2002, the parties to the Third Party Complaint filed cross motions for summary judgment based only on Count I, the contractual indemnification claim.  In November 2004, the court granted the motions for summary judgment of Fairfield and HealthSouth, finding that the indemnity provision had expired.  However, that Order only addressed the contractual indemnification claims of Count I and did not consider the claim for common law indemnification against Fairfield in Count II.  The court inadvertently ordered that all claims against both parties had been adjudicated and dismissed both Fairfield and HealthSouth with prejudice (doc. 121). Tenet Corp. sought entry of final judgment in favor of Fairfield and HealthSouth pursuant to Rule 54(b).  This court granted that motion, directed entry of final judgment, and dismissed the Third Party Complaint with prejudice in its entirety (doc. 123).  On appeal, the Eleventh Circuit discovered the procedural mistake; in April of 2007, it dismissed the appeal for want of jurisdiction, because all claims had not been adjudicated, the judgment was not "final," and the case was not properly certified under 54(b).

On remand, this court modified its previous summary judgment opinion and Order (doc. 195).  It did not modify its holding that both Fairfield and HealthSouth were entitled to summary judgment on Count I, the contractual indemnification claim.  Accordingly, the modified Order still resulted in the dismissal of all claims against HealthSouth.  However, since Count II, which was not adjudicated, stated a common law indemnity claim against Fairfield only, Fairfield was not

4

due to be dismissed.

For a second time, Tenet Corp. moved for entry of judgment pursuant to 54(b), this time only as to HealthSouth.  This court subsequently granted that motion, directed an entry of final judgment in favor of Third Party Defendant HealthSouth, and dismissed the Third Party Complaint with prejudice against HealthSouth. Tenet Corp. filed a second interlocutory appeal. The Eleventh Circuit granted its motion to submit the appeal on the record.

On June 17, 2008, the Eleventh Circuit reversed the Order of this court granting HealthSouth's motion for summary judgment and vacated its Order dismissing Tenet Corp.'s Third Party Complaint against HealthSouth.  It found that this court had erred in ruling that the contractual indemnity agreement between Tenet Corp. and the Third Party Defendants, upon which the Third Party Complaint was partially based, had expired.

On June 19, 2008, this court granted Tenet Corp's renewed motion for leave to amend its answer with a second amended third party complaint, and Tenet Corp. filed an Amended Third Party Complaint against Fairfield and HealthSouth.  On July 1, 2008, Tenet Corp. filed one of the motions before this court, a renewed motion for partial summary judgment on its contractual indemnity claims against Fairfield and HealthSouth (doc. 258).

### Remaining Motions

The motions currently before the court are:

(1) "Motion for Partial Summary Judgment" (doc. 225) filed by Lloyd Noland Foundation, Inc.;

(2) "Renewed Motion for Partial Summary Judgment" (doc. 258) by Tenet Corp.;

(3) "Cross-Motion for Partial Summary Judgment" (doc. 262) by Tenet Corp. and Tenet

5

Medical. _____

## II.  FACTS

The court has articulated the facts of this case in its prior memorandum opinions (docs. 120 and 159, 174, 202).  Therefore, only a brief summary of the facts relevant to the motions at issue will be necessary.

On October 4, 1996, the Foundation and Tenet Medical entered into a Stock Purchase Agreement, including an "Amendment Number Two," whereby Tenet Medical acquired the assets of the Lloyd Noland Hospital in Fairfield, Alabama.  Two separate corporate entities were created for the purpose of effectuating the sale of the Hospital –  Tenet HealthSystem Lloyd Noland Medical, Inc.("THLNM") and Tenet HealthSystem Lloyd Noland Properties("THLNP") (collectively, "Tenet Lloyd Noland").  In agreeing to sell the Hospital, the Foundation, through Amendment Number Two, reserved an option to repurchase 120 hospital beds, referred to as "the LNF Beds," from "the Corporation" – presumably either THLNM, who signed the amendment, or the collective Tenet Lloyd Noland –  for $1.00.  Also through Amendment Number Two, *Tenet Medical* and THLNM agreed to cooperate with the Foundation in having the LNF Beds relicensed, recertified or relocated for long-term acute care purposes.  In addition, Tenet Lloyd Noland agreed to assume the Foundation's responsibilities under the Lloyd Noland Retiree Medical Discount Program ("Retiree Program"), and *Tenet Medical* agreed to indemnify the Foundation against any damages incurred in relation to Tenet Lloyd Noland's assumption of the Retiree Program obligations.

On the same day that the parties executed the the Stock Purchase Agreement, the Foundation and THLNM also executed a lease agreement ("the Lease") whereby THLNM agreed

6

to lease back to the Foundation at some later time 19,972 square feet of space in the Hospital.  The obligation to lease space would commence no later than thirty days following notice by the Foundation to THLNM of its receipt of a certificate of need ("CON") from the State of Alabama Health Planning and Development Agency ("SHPDA") for the operation of the LNF Beds.

The same day as the Stock Purchase Agreement and the Lease was executed, Tenet Healthcare Corp. – the parent corporation of Tenet Medical – and the Foundation entered into a Guaranty Agreement; the Guaranty Agreement was an express condition to the sale of the Hospital and as security for performance of the obligations assumed by Tenet Medical and Tenet Lloyd Noland under the Stock Purchase Agreement.  Under the terms of the Guaranty Agreement, Tenet Corp. agreed to unconditionally guarantee the performance of certain obligations and duties by Tenet Corp., Tenet Medical, and any affiliate of Tenet Corp.  The Guaranty Agreement identified those obligations as follows: "obligations by [Tenet Medical] pursuant to the Stock Purchase Agreement and of the continuing obligations of [Tenet Medical and other Tenet companies] under Article XV of the Stock Purchase Agreement and of the obligations of THLNM pursuant to Article IX of the Lease . . . ."

Also on October 4, 1996, the Foundation sent Tenet Medical a letter, referred to as the "Grant Letter," offering to pay Tenet Medical one million dollars per year for a community health assessment to be conducted over a four-year period.  Tenet Medical accepted the terms of the Grant Letter.

On November 15, 1999, just over three years after the Foundation sold the Hospital to Tenet Medical, the collective Tenet Lloyd Noland sold the Hospital assets to Fairfield.  On October 21, 1999, the parties executed an "Asset Sale Agreement" and under that agreement,

7

Fairfield expressly assumed certain obligations of the collective Tenet Lloyd Noland, including its obligations relating to the LNF Beds and the Lease.  Fairfield financed the purchase by executing a Promissory Note ("the Note").  HealthSouth was not a party to the Note, but guaranteed Fairfield's payment of the Note through a Guaranty Agreement with Tenet Corp.  HealthSouth's Guaranty Agreement originally did not include an indemnity agreement.

At the time of Fairfield's purchase of the Hospital, the Foundation was pursuing a lengthy reapplication process, seeking two CONs to reclassify 100 existing "acute care" beds at the hospital to "long-term acute care beds."  On February 11, 2000, Fairfield sued the Foundation in the Circuit Court for Montgomery County, seeking a judgment declaring, among other things, that the Foundation's option to repurchase the LNF Beds was void and unenforceable, and that the SHPDA should be enjoined from further considering the Foundation's applications for CONs related to the LNF Beds.  Fairfield also filed a motion to intervene and a motion to stay in the Foundation's CON application proceedings before SHPDA.

Fairfield did not pay the Note when it became due.  As a result, in May of 2000, Tenet Corp., Fairfield, and HealthSouth signed an Agreement Regarding Amendment of Secured Promissory Note ("the Agreement Regarding Amendment").  This document gave Fairfield and HealthSouth six additional months to pay the Note to Tenet Corp.  The Agreement Regarding Amendment contained the indemnity provision at issue ("the Indemnity Provision"):

> <u>Indemnification obligation</u>: The Authority and Guarantor [HealthSouth] shall jointly and severally indemnify Payee [Tenet Corp.] for any loss, damage, expenses, or costs (including attorney's fee) incurred by Payee that are attributable to any claim by the Lloyd Noland Foundation, an Alabama nonprofit corporation ("LNF"), after the Closing Date (as such term is defined in the Asset Sale Agreement) with respect to "LNF beds" as such term is used in Schedule 1.7(f) to the Asset Sale Agreement and/or the Lloyd Noland Retiree Medical Discount Program, referenced in Schedule

1.7(f).

(doc. 81, Ex. F, at 3).  The Indemnity Provision did not contain an expiration date.

On November 15, 2000, HealthSouth paid the Note in full.  Tenet Corp. subsequently acknowledged full payment in several letters and returned the Promissory Note to HealthSouth.  On May 2, 2001, Tenet Corp. formally demanded indemnity from Fairfield and HealthSouth under the Agreement Regarding Amendment.

On February 22, 2002, the Alabama Supreme Court entered a decision in the state court litigation largely favorable to the Foundation.  *Lloyd Noland Found., Inc. v. Fairfield Healthcare Auth.*, 837 So. 2d 253 (Ala. 2002).  Specifically, the Alabama Supreme Court held that Fairfield assumed Tenet Lloyd Noland's obligations to transfer the beds back to the Foundation and cooperate in their recertification, relicensing, and relocation for long-term acute care; Fairfield breached the cooperation clause by seeking to intervene in the certification process; Tenet Lloyd Noland's agreement to lease space back to the Foundation for long-term acute care beds was valid and enforceable against Fairfield; and although Fairfield had not breached that lease, it owed a duty to renegotiate the lease in good faith when the Foundation attained the CONs.  By the end of October 2002, the Montgomery County Circuit Court had determined that Fairfield successfully transferred to the Foundation the LNF Beds.[1]

Meanwhile, the Foundation instituted the present lawsuit against Tenet Corp. for alleged violation of the parties' Guaranty Agreement.  Additionally, in the now-consolidated

---

[1]  *See* Exh. RR to Hinton Aff (Doc. 141), report from alacourts.com showing order dated Oct. 29, 2002 "that court's order compelling sale of hospital beds has been complied w[ith] . . . ."

action, Tenet Medical filed suit against the Foundation, for alleged breaches of the Stock
Purchase Agreement and the Grant Letter.

### III.  STANDARD OF REVIEW

Summary judgment allows a trial court to decide cases where no genuine issues of
material fact are present.  *See* Fed. R. Civ. P. 56.  A court must determine two things: (1)
whether any genuine issues of material fact exist; and if not, (2) whether the moving party is
entitled to judgment as a matter of law.  *Id*.

The moving party "always bears the initial responsibility of informing the district
court of the basis for its motion, and identifying those portions of the 'pleadings, depositions,
answers to interrogatories, and admissions on file, together with the affidavits, if any,' which
it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v.
Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The movant can meet this
burden by offering evidence showing no dispute of material fact, or by showing that the
nonmoving party's evidence fails to meet some element of its case on which it bears the
ultimate burden of proof.  *Celotex*, 477 U.S. at 322-23.  Once the movant meets this burden,
Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own
affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,'
designate 'specific facts showing that there is a genuine issue for trial.'"  *Id*. at 324 (quoting
Fed. R. Civ. P. 56(e)).  The responding party does not need to present evidence in a form
admissible at trial; "however, he may not merely rest on [his] pleadings."  *Id*.

In reviewing the evidence submitted, "the evidence of the nonmovant is to be
believed and all justifiable inferences are to be drawn in [its] favor."  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "The nonmovant need not be given the benefit of every inference but only of every reasonable inference."  *Graham v. State Farm Mutual Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).  After both parties have addressed the motion for summary judgment, the court must grant the motion if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  However, the nonmovant can defeat summary judgment by showing either a genuine issue of material fact or that the movant is not entitled to judgment as a matter of law.____

### IV.  DISCUSSION

**A.  The Foundation's Motion for Partial Summary Judgment and Tenet Corp.'s Cross-Motion for Partial Summary Judgment**

The Foundation's motion for partial summary judgment addresses the following issues: (1) Tenet Medical's liability on the Foundation's counterclaims, alleging that Tenet Medical breached the Stock Purchase Agreement; and (2) Tenet Corp.'s liability under the Guaranty Agreement.  Because, in the Guaranty Agreement, Tenet Corp. unconditionally guaranteed certain obligations of the Tenet companies, the two issues are intertwined.  Expressed another way, the Foundation's motion requests the court to determine whether the Tenet companies' assignment of obligations as part of the sale to Fairfield relieved them of liability under the Stock Purchase Agreement and the Lease when Fairfield breached those obligations.  Further, the motion requests the court to determine whether that assignment relieved Tenet Corp. of liability under the Guaranty Agreement.

#### 1.  Validity of Assignment

The Foundation previously disputed the validity of the assignment because of the

Stock Purchase Agreement's express requirement that Tenet Medical obtain the Foundation's prior written consent before assignment, which consent Tenet Medical did not obtain for the sale of the Hospital to Fairfield.  However, as this court previously ruled, pursuant to provision 11.1 of the Stock Purchase Agreement, the covenant requiring prior written consent expired on October 4, 1999 – before the assignment. (docs. 201 & 202).  The Foundation obviously desired to control the identity of any such assignee for a three-year period; the contract reflects strict limitations on the identity of that assignee in Section 19.2, and Section 11.1 provides that those limitations would exist for three years.  If the Foundation desired for the strict limitations on the assignments to remain in place after three years, the parties certainly knew how to draft clauses to reflect that agreement.  The court need look only to Article XV relating to the LNF beds and its clause stating that provision would be effective for fifteen years, notwithstanding section 11.1.  Yet, no such clause exists in the contract regarding assignment.  Accordingly, the court finds that the Tenet companies[2] had the right to assign the obligations after the three-year period without the Foundation's prior, written

---

[2]The court notes that some confusion exists because of the complicated relationship among the various Tenet companies.  For example, the only Tenet entity that was a party to the original Stock Purchase Agreement with the Foundation was Tenet Medical; it was the "Purchaser" and no other Tenet entity signed the unamended agreement.  Accordingly, the Foundation's Counterclaim names Tenet Medical as Counterclaim Defendant for allegedly failing to perform its obligations under the Stock Purchase Agreement. However, when Amendment Number Two to the Stock Purchase Agreement was executed, not only did Tenet Medical sign as "Purchaser" but THSLNM signed as well, acknowledging that it "joins in this Amendment Number Two for the purpose of agreeing, and by its signature does hereby agree, to comply with the provisions of Article XV of the Agreement as it pertains to the Option Beds."  Subsequently, when the Asset Sale Agreement was executed between Fairfield and the collective Tenet Lloyd Noland, Tenet Medical was not named as a party to that contract; the agreement listed as Sellers the collective Tenet Lloyd Noland companies.  Accordingly, the Tenet entity that was the  "Purchaser" of the Hospital in 1996 is not the same Tenet entity that was the "Seller" of the Hospital in 1999 and assignor of related obligations.

Despite the court's reference to this confusion in its September 28, 2007 Memorandum Opinion (doc. 202, at 14, n.6),  none of the parties has raised or briefed this issue or provided the court with any further assistance as it attempts to wade through the quagmire of Tenet companies, Tenet contracts, and Tenet assignments.   In light of the court's finding that the assignment does not relieve the Tenet companies of liability, this issue regarding the shifting identity of purchaser versus seller/assigner is perhaps academic.

consent.  Because the court has rejected the objection raised to the validity of the assignment – the failure to procure consent for the assignment outside the three-year limitations period – the court will address the Tenet companies' liability after that assignment.

### 2.  Tenet Medical's Liability After Assignment

In support of its argument that Tenet Medical's liability remains after its sale and assignment of the Hospital, the Foundation presents a number of cases supporting the general rule that assignment of a contract does not relieve the assignor of its obligations under the assigned contract.[3]  Four of the cases that the Foundation cites for that proposition are decisions of the Alabama Supreme Court or a federal court applying Alabama law.  *See Ingalls Iron Works Co. v. Fruehauf Corp.*, 518 F.2d 966, 969 (5th Cir. 1975) (applying Alabama law);  *DuPont v. Yellow Cab Co.*, 565 So. 2d 190, 194 (Ala. 1990); *Meighan v. Watts Constr. Co.*, 475 So. 2d 829, 834 (Ala. 1985); *Copeland v. Beard*, 217 Ala. 216, 115 So. 2d 389 (1928)

In *Yellow Cab*, a bus driver was injured when the bus brakes failed, causing the bus to hit a tree.  The bus driver sued Yellow Cab, claiming to be an intended third-party beneficiary under a contract between Yellow Cab and the Birmingham Board of Education that required Yellow Cab to provide transportation for its students and to perform maintenance and repairs on the buses.  Yellow Cab argued that it subcontracted with another party to provide the transportation under the contract, creating a new contract between the Board and the subcontractor and releasing Yellow Cab from liability under the old contract.  The district

---

[3]  The court appreciates the Foundation's efforts to cite the court to controlling primary authority as opposed to relying on merely a persuasive tertiary hornbook, as it did in its prior brief.  Providing the court with the tools to do its job is one of an advocate's prime duties.

court entered partial summary judgment for Yellow Cab.  565 So. 2d at 191.  On appeal, the

Supreme Court of Alabama rejected Yellow Cab's argument, finding that Yellow Cab's

contract with a third party did not relieve it as a matter of law of its obligations under the

contract with the Board.  It affirmed summary judgment on other grounds.  *Id.* at 192.

Although Justice Jones filed a dissenting opinion in that case, he agreed with the majority on

its finding that Yellow Cab's subcontract did not relieve it of its obligations under the

original contract, stating that "one of the most fundamental tenets of contract law. . . is that

one may not simply delegate a duty to another and thereby discharge his own obligations to

perform that duty."  *Id.* at 195 (citing *Callon Petroleum Co. v. Big Chief Drilling Co.*, 548

F.2d 1174 (5th Cir. 1977)).

     In *Ingalls Iron Works*, the Fifth Circuit acknowledged that Alabama law followed that

same fundamental tenet regarding liability after assignment.  518 F.2d at 969.   In that case, a

subcontractor sued the owner of an Alabama building for breach of contract, demanding the

balance due on a purchase order.   The owner denied liability, stating that it had transferred

its obligations and liabilities under the contract to its general contractor.   The owner argued

that the transfer substituted the general contractor in the place of the owner and created a

novation.  *Id.* at 969-67.  After the district judge granted summary judgment in favor of the

owner, the subcontractor appealed.  The Fifth Circuit, applying Alabama law, noted with

approval the general rule that "[m]ere assignment of the obligation from one debtor to

another . . . will not suffice to release the original debtor . . . ."  *Id.* at 967.  However, it

acknowledged an exception to the general rule when the original parties evidence a "clear

intent" to allow substitution of obligors.  *Id.*   Because the evidence on the record did not

unequivocally show a "clear intent" that the owner could shift his contract liability to a third party, the Fifth Circuit found that a genuine issue of material fact existed and reversed the summary judgment. *Id.* at 969-70.

Although the court recognizes this general rule of contracts, it nevertheless acknowledges that the parties to the original contract had the freedom to establish a contract that varies from the general rule and that allows a substitution of the liable party via a novation.[4]  If parties wish to allow the obligor to shift liability to a third party in derogation of the general rule, the original contracting parties must clearly and unequivocally show such an intent. *See Ingalls Iron Works,* 518 F.2d at 969.

In the instant case, the Stock Purchase Agreement itself provides no language expressly shifting contract liability after assignment from Tenet Medical to its assignee. Indeed, the only express language regarding liability after assignment is contained in Section 19.2 of that agreement and states an intention that the assignment *not* shift liability.  Section 19.2 – which involves assignment to specifically identified entities – provides that "any assignment pursuant to Section 19.2(i)[5] or 19.2 (ii)[6] above shall not relieve Purchaser from any of its obligations under this Agreement."  (doc. 264, Ex. 1, at 68).  Although this provision relates only to the specifically identified assignments and has expired (*see* Section 11.1; doc. 201),  the court refers to it because it relates to post-assignment liability and may

---

[4]However, *in Copeland v. Beard*, 217 Ala. 216, 115 So. 389 (1928), the Supreme Court of Alabama appeared to say that the original obligor may remain liable as a quasi-surety even after the parties established a novation.  Because the instant case does not present evidence of a novation, the court need not address this dilemma.

[5] Section 19.2 (it) provides for assignments to Alabama Health Services.

[6] Section 19.2 (ii) provides for assignments to Tenet companies or Tenet-controlled companies.

provide some guidance about the intention of the parties.  However, Section 19.2 is silent
about whether a broader assignment to any other entities would or would not relieve Tenet
Medical from obligations under the agreement.

If the parties intended their *silence* to suggest that any other assignments *would* shift
liability from Tenet Medical to the assignee, that intention is curious because it flies in the
face of the general rule that assignment does not relieve the assignor of liability.  Further, if
the parties desired that liability flow against that general rule, they must express that intention
clearly and unequivocally.  *See Ingalls Iron Works,* 518 F.2d at 969.  Because the Stock
Purchase Agreement contains no express and unequivocal language of the parties' intention
to shift liability upon assignment, this court applies the general rule of contracts regarding
assignments and the retained liability of the assignor.

The court notes that this ruling is consistent with the Tenet companies' entering into
an indemnity provision with Fairfield and HealthSouth.  If the Tenet companies truly
expected and intended that the assignment to Fairfield would automatically extinguish all
liabilities for the obligations in question, then the Indemnity Provision would be superfluous
after payment of the Note. As the Eleventh Circuit explained:

> The purpose of the Indemnity Provision was for Tenet to be indemnified by
> Fairfield and HealthSouth at all times – before and after the Note was
> satisfied – for claims regarding the LNF beds and the LNF retiree medical
> discount program.  The reason Tenet desired indemnity is still present and is
> unrelated to the Note.  And, we are unable to discern any reason why Tenet
> would want this indemnity to be in effect for only six months until the date
> the Note was due to be paid. Nothing in the record suggests that any losses
> as a result of claims regarding the LNF beds or the LNF retiree medical
> discount program would be incurred by Tenet within six months.

(doc. 236, at 13).   If the Indemnity Agreement is not superfluous but had and has purpose after

payment of the Note, then the logical corollary to that purpose is that Tenet Corp. recognized its potential liability after assignment for any obligations that Fairfield failed to perform.

The Tenet companies also argue that the only entities that could perform the obligations under the Stock Purchase Agreement would be entities in control of the Hospital. For example, an entity, such as Tenet Health, that was not in possession of the Hospital and the LNF beds could not convey them to the Foundation. Therefore, they argue that the sale of the Hospital would necessarily extinguish that obligation, and the Foundation would have understood that fact. Although the court acknowledges that this argument carries with it a dose of common sense, logic, and fairness, the Tenet companies provide the court with no law of any kind supporting this proposed exception to the general rule, and this court will not carve out its own exception.

Accordingly, the court finds that the general rule applies and that the assignment did not relieve the Tenet companies of liability under the Stock Purchase Agreement.

### 3. Tenet Corp.'s Liability under the Guaranty Agreement

Given that Tenet Medical remains subject to liability under the Stock Purchase Agreement after the assignment to Fairfield, the court must next decide whether and to what extent Tenet Corp. remains liable under the Guaranty Agreement. Alabama follows the general rule that guaranty agreements, being but one type of contract, are controlled by general principles of contract law. *Dill v. Blakeney*, 568 So. 2d 774, 777 (Ala. 1990). As with any contract, when the terms of a guaranty agreement are unambiguous, the construction and legal effect of the guaranty contract are questions of law for the court to determine. *Robbins Tire & Rubber v. Hunt*, 669 So. 2d 969, 970 (Ala. Civ. App. 1995). The Guaranty Agreement binds Tenet Corp. only to the extent and manner stated by the plain language of the agreement. *See Gov't Street*

*Lumber v. AmSouth Bank*, 553 So. 2d 68, 75 (Ala. 1989) ("a guarantor is bound only to the

extent and in the manner stated in the contract of guaranty") (quoting *Pate v. Merchants Nat'l*

*Bank of Mobile*, 428 So. 2d 37, 39 (Ala. 1983)).  Moreover, because a guaranty secures only the

primary obligation, the liability of Tenet Corp. also depends upon the construction and

application of the primary contract(s).  *See Ex part Kaschak*, 681 So. 2d 197, 201 (Ala. 1996)

(lessor must prove its claim on the underlying lease agreement to recover on the unconditional

guaranty of that lease).

This court has previously found that the Guaranty Agreement is unambiguous. (docs. 201

& 202).  Under the unambiguous terms of the Guaranty Agreement, Tenet Corp. agreed to

guarantee the performance of (1) Tenet Medical's obligations under the Stock Purchase

Agreement; (2) the obligations of Tenet Medical, Tenet Corp. and any Tenet affiliate under

Article XV of the Stock Purchase Agreement, dealing with Long-Term Acute Care, including

LNF Beds; and (3) Tenet Lloyd Noland Medical's obligations under Article IX of the Lease.

The Guaranty Agreement is by its terms "unconditional."  It provides:

> Guarantor [Tenet Corp.] hereby unconditionally guarantees
> the performance of the Obligations.  Further, Guarantor hereby
> unconditionally guarantees the payment of all costs, attorneys' fees or
> expenses which may be incurred by Seller [the Foundation] by reason
> of a default by Purchaser [Tenet Medical], Guarantor, or any Affiliate
> of Guarantor under this Agreement or with respect to the Obligations.
>
> This Guaranty Agreement is an unconditional guaranty.
> Guarantor agrees that the Seller, in the event of a default of Purchaser
> or any Affiliate of Guarantor, shall not be required to assert any claim
> or cause of action against the Purchasor (sic) or any Affiliate of
> Guarantor before asserting any claim or cause of action against the
> Guarantor under the Guaranty Agreement.

(doc. 18, Ex. A; ).   This court has previously found that *if the Guaranty Agreement is triggered,*

18

the scope of its guaranty is broad and sweeping.  (doc. 202).

Tenet Corp. insists that the Guaranty Agreement guaranteed only the performance of the Tenet entities and does not cover the alleged breaches of the Stock Purchase Agreement caused by *assignee* Fairfield.  However, that argument ignores the language of the agreement; the issue is not whether the agreement *listed* Fairfield as an obligor, but whether the listed obligors were liable for Fairfield's breach.  Even after assignment of those obligations, the Tenet companies were still liable if their assignee did not perform them.  *See Ingalls Iron Works,* 518 F.2d at 969; *DuPont v. Yellow Cab Co.*, 565 So. 2d at 194.  Accordingly, Tenet Corp. incorrectly asserts that the Stock Purchase Agreement does not cover Fairfield's failure to perform.  *To the extent that Tenet Medical and THLNM are still liable for the obligations that Fairfield failed to perform*, the Guaranty Agreement covers those obligations.  If the Tenet companies chose to assign those obligations, Tenet Corp.'s best interest was to ensure that Tenet Medical assigned them to a reliable entity likely to perform.  However, its choice of assignee was unfortunate, and the Tenet companies must now live with the consequences.

Any other finding would render the Guaranty Agreement worthless after assignment; any other finding would allow the guarantor and the party whose performance it guaranteed to escape responsibility by the expedient tool of assignment.  The court finds that the law does not allow such an easy flight from obligations.

Tenet Corp. argues, however, that even if Tenet Medical and THLNM  remain liable for the breaches in question, the Guaranty Agreement nonetheless terminated with the sale of the Hospital.  It notes that the Guaranty Agreement does not contain any durational term and asserts that the law, therefore, presumes that the parties intended it to endure for a "reasonable time."

19

*See William R. Hubbell Steel Corp. v. Epperson*, 679 So. 2d 1131, 1133 (Ala. Civ. App. 1996) ("In a contact which has not fixed time for performance, the law presumes that the parties intended to contract for a reasonable time," quoting Restatement (Second) of Contracts § 33 with approval.) According to Tenet Corp., a "reasonable time" would expire with the sale of the Hospital, because at that time, the Tenet companies would no longer have control of the assets required for performance of the obligations.

However, Tenet Corp.'s argument ignores the express terms of the Guaranty Agreement and the Stock Purchase Agreement. The Guaranty Agreement expressly covers Article XV of the Stock Purchase Agreement, which contains the Option Beds Provision (doc. 264, Ex. 2, at 1). Article XV of the Stock Purchase Agreement contains an express reference to its duration: "The terms of this Article XV shall continue to be fully effective and enforceable following the Closing Date for a period of fifteen (15) years." (doc. 264, Ex. 1, ¶15.6). Further, the Guaranty Agreement specifically provides that the sale of the assets or any of its Affiliates shall not affect its obligations:

> *This Guaranty Agreement shall not be affected, modified, **or** impaired by the voluntary or involuntary liquidation, dissolution, **sale** or other disposition of all or substantially all of the assets*, marshaling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition with creditors or readjustment of, or other similar proceedings affecting the Purchaser [Tenet Medical], the Guarantor [Tenet Corp.] or any affiliate of the Guarantor or any other Guarantor, or any of the assets belonging to one or more of them, nor shall this Guaranty Agreement be affected, modified, or impaired by the invalidity of the Stock Purchase Agreement or any instrument executed in connection therewith.

(doc. 18, Ex A, at 1-2) (emphasis supplied). Given these express terms, Tenet Corp.'s argument that the Guaranty Agreement expired upon the sale of the Hospital fails. Therefore, the court

20

finds that the Guaranty Agreement remains in effect after the sale of the Hospital and covers the Tenet companies' "obligations" listed in that agreement.

Accordingly, the court will GRANT the Foundation's motion for partial summary judgment to the following extent: (1)  the court finds that Tenet Medical and THLNM are liable under the Stock Purchase Agreement even after the assignment of those obligations, *to the extent that Fairfield did not perform those obligations;* and (2) the court finds that the Guaranty Agreement remains in effect and covers the Tenet companies' "obligations" listed in that agreement.[7]

For the same reasons discussed above, the court will DENY Tenet Corp.'s cross-motion for partial summary judgment.

## B.  Tenet Corp.'s Renewed Motion for Partial Summary Judgment

In support of its motion for partial summary judgment, Tenet Corp. points the court to the Eleventh Circuit decision addressing the contractual indemnification claim.  (doc. 236).  That decision reversed this court's Order granting HealthSouth's motions for summary judgment, and further, vacated the court's Order dismissing Tenet Corp.'s Third Party Complaint against HealthSouth.  It found that this court had erred in ruling as a matter of law that the contractual indemnity agreement between Tenet Corp. and the third party defendants had expired.  In light of that decision, Tenet Corp. requests the court to grant it summary judgment and to find that

---

[7]The motion by the Foundation does not clearly state the precise relief it requests as to the "liability" of the Tenet companies.  If it seeks a declaration that the Tenet companies are in fact liable for specified breach(es) by Fairfield, it should specifically so state.  The court will not infer such a request from footnote 2 in its brief that concedes "disputed issues of fact as to the claims relating to the Retiree Benefit Plan and the Grant letter."

HealthSouth and Fairfield[8] are liable to Tenet Corp. on the contractual indemnity claim in Count I of the Third Party Complaint.

HealthSouth argues that although the Eleventh Circuit found that the indemnity provision had not expired and that this court had improperly granted summary judgment on that ground, the Eleventh Circuit did *not* instruct the court to enter summary judgment in favor of Tenet Corp.  In other words, HealthSouth argues a finding that summary judgment in favor of Healthsouth is *not* warranted does not necessarily lead to the conclusion that summary judgment in favor of Tenet Corp is appropriate.  Although stating a correct principle, HealthSouth cannot avoid summary judgment in this case.

In arguing against summary judgment on the indemnity issue, HealthSouth finds itself uncomfortably caught between a modern day version of Scylla and Charybdis, i.e., between a rock and a hard place.  On one side looms the Eleventh Circuit's decision reversing this court's grant of summary judgment in HealthSouth's favor.  Now, to survive summary judgment in favor of Tenet Corp. and *against* it,  HealthSouth must successfully negotiate around this unfavorable finding.  HealthSouth attempts to do so by construing the Eleventh Circuit's decision as identifying ambiguities in the Indemnity Provision that raise genuine issues of material fact and render summary judgment for Tenet Corp. inappropriate.  Yet, that argument is also fraught with danger:  HealthSouth must somehow side-step a separate "hard place" – its prior position that the language of the contract documents is unambiguous (*see* HealthSouth's repeated characterization of those documents as "unambiguous" in doc. 80, pp. 12-16; doc. 91, p. 4).

---

[8]Fairfield is without counsel and has not responded to Tenet Corp.'s renewed motion for partial summary judgment.

Appearing to recognize its precarious position, HealthSouth ignores its previous stance and confines its argument on ambiguity to the Eleventh Circuit's discussion of those documents. HealthSouth refers the court to passages in the Eleventh Circuit's decision where – so HealthSouth claims –  the Eleventh Circuit acknowledges ambiguities in the contract documents that comprise or relate to the indemnity agreement.

For example, HealthSouth cites to the passage in which the Court of Appeals addressed the contractual construction of the terms "Payee" and "Guarantor" in the Indemnity Provision. The court stated:  "And we doubt that these terms present an ambiguity."  To the extent that the terms did raise any potential ambiguity, however, the Court of Appeals resolved it by examining the provision in context; it recognized that the matter was one of contract interpretation and not one involving a genuine issue of material fact.

This court disagrees with HealthSouth's reading of the Eleventh Circuit's opinion.  That opinion found as a matter of law that the Indemnity Provision in question did not expire upon payment of the note.  Any discussion of arguable ambiguities was within the context of contract construction, which the Eleventh Circuit resolved as a matter of law; no genuine issues of material fact exist regarding the viability of the Indemnity Provision.  Accordingly, if HealthSouth intended to use the Eleventh Circuit's own words to establish a genuine issue of material fact on the viability of the Indemnity Provision, its reliance on these passages is misplaced.

In light of the Eleventh Circuit's opinion, the court finds that the Indemnity Provision did not expire and remains viable; HealthSouth and Fairfield must indemnify Tenet Corp. *if the indemnity liabilities are triggered*.  However, before making a final decision on Tenet Corp.'s

23

motion for summary judgment, the court must first decide whether the indemnity liabilities are triggered.

In the Indemnity Provision, Fairfield and HealthSouth agree to indemnify Tenet Corp. for damages it may owe Foundation based on Fairfield's failure to act with respect to the LNF Beds and the LNF retiree medical discount program:

> Indemnification obligation: The Authority and Guarantor [HealthSouth] shall jointly and severally indemnify Payee [Tenet Corp.] for any loss, damage, expenses, or costs (including attorney's fee) incurred by Payee that are attributable to any claim by the Lloyd Noland Foundation, an Alabama nonprofit corporation ("LNF"), after the Closing Date (as such term is defined in the Asset Sale Agreement) with respect to "LNF beds" as such term is used in Schedule 1.7(f) to the Asset Sale Agreement and/or the Lloyd Noland Retiree Medical Discount Program , referenced in Schedule 1.7(f).

(doc. 81, Ex. F, at 3).  Indeed, HealthSouth and Fairfield entered into the Indemnity Agreement *after* Fairfield took the actions that give rise to some of the Foundation's claims of breach. Accordingly, to the extent that the Tenet companies may be liable to the Foundation, then HealthSouth and Fairfield owe indemnity to Tenet Corp.

In summary, the court will GRANT Tenet Corp.'s motion for partial summary judgment to the extent that it requests a ruling that the contractual indemnity obligation contained in Section 6 of the Agreement Regarding the Amendment of the Secured Promissory Note remains in effect against HealthSouth and Foundation.

24

## V.  CONCLUSION

### A.  The Foundation's Motion for Partial Summary Judgment and Tenet Corp.'s Cross-A. Motion for Partial Summary Judgment

In conclusion, the court will GRANT the Foundation's motion for partial summary judgment to the following extent: (1)  the court finds that Tenet Medical and THLNM are liable under the Stock Purchase Agreement even after its assignment of those obligations *to the extent that Fairfield did not perform those obligations*; and (2) the court finds that the Guaranty Agreement remains in effect and covers the Tenet companies' "obligations" listed in that agreement.

For the same reasons discussed above, the court will DENY Tenet Corp.'s cross-motion for partial summary judgment.

### B.  Tenet Corp.'s Motion for Partial Summary Judgment

The court will GRANT Tenet Corp.'s motion for partial summary judgment to the extent that it requests a ruling that the contractual indemnity obligation of HealthSouth and Fairfield contained in Section 6 of the Agreement Regarding the Amendment of the Secured Promissory Note remains in effect; the court so rules.

Dated this 24th day of September, 2008.

*Karon O. Bowdre*
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE